IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 26, 2019 Session

**HAROLD FRANCIS BUTLER, III v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
**No. 299585   Don W. Poole, Judge**

_____

**No. E2018-00914-CCA-R3-PC**

_____

The Petitioner, Harold Francis Butler, III, appeals the Hamilton County Criminal Court's denial of his petition for post-conviction relief from his convictions of first degree felony murder, attempted first degree premeditated murder, attempted especially aggravated robbery, and employing a firearm during the commission of a dangerous felony and resulting sentence of life plus thirty-one years.  On appeal, the Petitioner contends that the State violated his constitutional rights by conducting an unduly suggestive identification procedure that rendered the identification unreliable and by eliciting false testimony from a key witness at trial.  He also raises numerous allegations of ineffective assistance of trial counsel and contends that he is entitled to a new trial under the cumulative error doctrine.  Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Brennan Maureen Wingerter (on appeal), Knoxville, Tennessee, and Brian Pearce (at hearing), Chattanooga, Tennessee, for the appellant, Harold Francis Butler, III.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; M. Neal Pinkston, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The Hamilton County Grand Jury indicted Steven Ballou, Unjolee Moore, John Simpson, and the Petitioner for the first degree felony murder of Bernard Hughes, the attempted especially aggravated robbery of Hughes, the attempted first degree premeditated murder of Timothy Westfield, and employing a firearm during the commission of a dangerous felony. The charges resulted from a failed robbery that was committed by several masked men on the night of June 28, 2010.

A jury convicted the Petitioner of the indicted offenses. On direct appeal of his convictions, this court summarized the proof at trial as follows:

[O]n the evening of June 28, 2010, Timothy Westfield, Myra Collier, and Cindy Cross were visiting their friend, Bernard Hughes, at his apartment on Oakwood Drive in Chattanooga. Shortly before 11:00 p.m., someone knocked on Mr. Hughes's front door. Mr. Hughes looked through the peephole on the door and turned back to Mr. Westfield with a "peculiar" look on his face. Mr. Hughes then opened the front door. Mr. Westfield testified that he saw two men standing outside the front door; one man, later identified as the [Petitioner], was wearing a ski mask, a black baseball cap, a black jacket, and black pants, and that man ordered Mr. Hughes to "lay it down," which Mr. Westfield interpreted to mean that the men were there to rob Mr. Hughes. Mr. Westfield identified the other man as John Simpson.

Mr. Hughes immediately ran outside and closed the front door behind him. Mr. Westfield instructed Ms. Collier and Ms. Cross to go upstairs, and Mr. Westfield hurried outside. As soon as Mr. Westfield appeared outside, he noticed that Mr. Hughes was attempting to fight off both of the would-be robbers. The [Petitioner] then raised a handgun and fired two shots at Mr. Westfield, striking him in his left forearm and right ring finger. Mr. Westfield briefly lost consciousness. When he regained consciousness, he saw a silver Nissan Maxima pull up, saw someone get into the Maxima, and saw the car pull away. Mr. Westfield attempted to render aid to Mr. Hughes, who was lying in a pool of blood on the front porch just outside his front door, and Mr. Westfield yelled for Ms. Collier and Ms. Cross to call 9-1-1. Mr. Westfield retrieved a blanket from the sofa in Mr. Hughes's apartment and used it to cover Mr. Hughes's body. The medical examiner, Doctor James Metcalfe, testified that gunshot wounds to Mr. Hughes's head and chest caused his death and that the manner of death was homicide.

Mr. Westfield testified that he had never seen Mr. Simpson prior to June 28 but that he had seen the [Petitioner] on several prior occasions,

- 2 -

including during the time period in which both the [Petitioner] and Mr. Westfield had attended barber college together. Mr. Westfield admitted at trial that he initially told law enforcement officers that he did not know either of the men who attempted to rob Mr. Hughes, but he later identified the [Petitioner], explaining that both he and the [Petitioner] have very distinctive eyes and noses. Mr. Westfield stated that he was "an artist" and that he paid "very close attention to detail." Mr. Westfield explained that he and the [Petitioner] both share a "high bridge" on their noses, which, according to Mr. Westfield, is uncommon among African-Americans and is usually a sign of "Indian heritage."

Chattanooga Police Department ("CPD") Officer Ken Burnette testified that, when he responded to the crime scene on June 28, he collected two .45-caliber shell casings and one live round of .45-caliber ammunition. He also collected one size-eight athletic shoe and a white baseball cap. He later processed a gold Nissan Maxima owned by Unjolee Moore. In the trunk of the Maxima, Officer Burnette found a pair of size eight-and-a-half Jordan athletic shoes and a ski mask, and he located a light blue bandana on the rear floorboard of the vehicle. Mr. Westfield testified that the size-8 shoe collected from the crime scene belonged to the [Petitioner]. Ms. Collier explained that Steven Ballou was her ex-boyfriend and that she knew Mr. Moore only by association. Ms. Collier recalled that on one prior occasion, Mr. Moore and Mr. Ballou had stopped by Mr. Hughes's apartment when Ms. Collier was visiting him. Ms. Collier testified that she did not know either Mr. Simpson or the [Petitioner].

John Simpson testified as a witness for the State and denied that he knew who had killed Mr. Hughes. Over the [Petitioner]'s objection, the trial court allowed the prosecutor to introduce the prior recorded statement Mr. Simpson made to law enforcement officers on July 15, 2010, in which Mr. Simpson stated that the [Petitioner] had, in fact, shot and killed Mr. Hughes.

CPD Sergeant Michael Wenger testified that, following an interview of Mr. Moore, he obtained arrest warrants for Mr. Simpson and the [Petitioner]. The [Petitioner] turned himself in to authorities on July 14, and Mr. Simpson was arrested on that same date. Sergeant Wenger interviewed Mr. Simpson on July 15 after fully advising him of his rights, and Mr. Simpson executed a written waiver of those rights. Sergeant Wenger testified that he did not threaten or coerce Mr. Simpson and that he

did not discuss any potential "deals" with Mr. Simpson prior to his statement.

      With this evidence, the State rested. Following the trial court's denial of the [Petitioner]'s motion for judgments of acquittal and a Momon colloquy, the [Petitioner] chose not to testify but did elect to present proof. Doctor Jeffrey Neuschatz, a professor of psychology at the University of Alabama at Huntsville, testified as an expert in the area of eyewitness identification. Doctor Neuschatz addressed the fallacies inherent in eyewitness identification and explained the concept of unconscious transference, wherein a person views a suspect in a lineup and selects that individual simply because the suspect looks familiar but not because the suspect actually committed the crime.

State v. Harold Francis Butler, No. E2014-00631-CCA-R3-CD, 2015 WL 2233122, at *1-2 (Tenn. Crim. App. at Knoxville, May 11, 2015), perm. app. denied, (Tenn. Sept. 17, 2015).

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely petition for post-conviction relief. In his pro se petition and the three amended petitions filed by counsel, the Petitioner alleged various reasons he received the ineffective assistance of counsel as well as a number of acts by the prosecution that deprived him of due process.

At the evidentiary hearing, Officer Mark Hamilton of the CPD testified for the Petitioner that part of his job duties involved cellular technology. He stated that cellular telephone companies sometimes recorded cellular telephone tower communications and that based on the data, he could identify the approximate location of a cellular device. Officer Hamilton said that using historical records, he could place a cellular telephone in a "sector" but could not locate the telephone with great accuracy. He did not need the actual device to locate the telephone. In 2010, AT&T saved engineering data for ten days and sector data for one year. He said that using the sector data, he could have located a device but that the location would have been measured in square miles and "wouldn't have been very accurate."

Timothy Westfield, one of the victims in this case, testified that on the night of the shooting, he had been at Bernard Hughes' home about ten minutes when they heard a knock on the door. Hughes opened the door, and Westfield saw the muzzles of two guns being held by two men. Hughes ran outside, and Westfield followed him. Westfield jumped toward the first person he saw. Westfield later saw the Petitioner on the news and recognized him as the person toward whom he jumped. Westfield said that the

Petitioner had cut Westfield's hair previously and that they had an encounter at a gas station a couple months before the shooting. The Petitioner was wearing a ski mask at the time of the shooting, but Westfield was able to recognize him from "something peculiar about his eyes" and the bridge of his nose.

Westfield testified that four men were in the yard: himself, Hughes, the Petitioner, and another man. As he dove toward the Petitioner, he saw "two flashes and everything went black." The next thing he remembered was seeing Hughes lying in front of the front door. He saw a silver Nissan Maxima pull up and "a black figure" come out from behind Westfield's car. The figure got into the Maxima, and the Maxima drove away. He recalled that the Petitioner was wearing black and teal blue clothing. Westfield acknowledged that the first time he identified the Petitioner as one of the perpetrators was at the preliminary hearing.

John Simpson, the Petitioner's codefendant, testified that he was arrested on July 13, 2010, and gave a recorded statement to the police a couple of days later. He spoke with Sergeant Wenger for thirty or forty minutes before giving his recorded statement. During that time, Sergeant Wenger told him certain things Sergeant Wenger knew about the case. Namely, Sergeant Wenger told him that the Petitioner was his primary focus and that the police had found a boot and a shotgun. When Sergeant Wenger began recording Simpson's statement, Simpson used the information to say what Sergeant Wenger wanted him to say. Simpson said that his statement was false and that he gave the false statement because Sergeant Wenger told him that he would get a fifteen-year sentence.

Simpson testified that he told Sergeant Wenger other stories before Sergeant Wenger started recording. However, the sergeant did not like what Simpson had to say, so he told Simpson "exactly what he had and how he felt that those things actually went." For example, Sergeant Wenger asked Simpson about the Nissan Maxima. Simpson said the car was black but learned just before the recording started that it was gold.

Simpson testified that he told Sergeant Wenger that he put on a mask and knocked on Bernard Hughes's door. Sergeant Wenger said the person who knocked on the door was not wearing a mask, so Simpson changed his story. He also invented a story about having a collision with another car on the way out of the parking lot.

Simpson testified that he gave a second statement on August 3 in which he told Sergeant Wenger that he and the Petitioner buried a gun in the Petitioner's backyard. However, his second statement also was false. Simpson had never been to the Petitioner's home, and the police did not find any guns or freshly-dug holes in the Petitioner's yard.

Simpson testified that the Petitioner's trial counsel did not ask Simpson at trial about any of his lies to the police. Trial counsel asked him if the Petitioner killed Bernard Hughes, and the truthful answer to that question was no. Simpson described some of the information he gave to police officers in his various statements and said he learned the information from Sergeant Wenger. He said he inserted the Petitioner's involvement into the shooting because "that's what [the police] wanted [him] to do" in order to receive a sentence less than life in prison.

On cross-examination, Simpson acknowledged sending a letter to the district attorney general before the Petitioner's trial. In the letter, he stated that there was a "'strong gang presence in this case'" and that the Petitioner and Ballou were "pushing" him not to testify because they could receive life sentences. However, he denied the veracity of the letter and said that "I can put anything I want into a letter." He said that he was stabbed in prison but that the stabbing had nothing to do with gangs or the Petitioner. Simpson acknowledged that the jury only heard a portion of his statement to Sergeant Wenger. Specifically, the jury heard the part of his statement in which he said he saw the Petitioner shoot Hughes and heard the Petitioner admit to shooting Hughes. He acknowledged that on cross-examination at trial, trial counsel asked him if the Petitioner shot Hughes. Simpson told trial counsel no.

On redirect examination, Simpson acknowledged that he no longer had a life sentence "hanging over his head." He therefore had no reason to lie about the Petitioner's involvement in the crimes.

Trial counsel testified for the Petitioner that he was appointed to represent the Petitioner in 2011 and that the Petitioner went to trial in 2013 or 2014. Trial counsel had tried three or four cases at the time of the Petitioner's trial, but none of them were first degree murder cases. Trial counsel acknowledged that he received a "considerable" amount of discovery from the State, which he reviewed before trial. He applied for an expert in identification but did not seek to have an investigator appointed because he did not think there was "any investigation that required the use of an investigator." He and the Petitioner discussed an alibi defense but ultimately decided against it. He did not remember the Petitioner ever explicitly requesting that he present an alibi. The Petitioner was "never definitive as far as he was at a certain place," and trial counsel did not think he had enough information to find the people mentioned by the Petitioner or to corroborate an alibi.

Post-conviction counsel asked if trial counsel remembered the name "Michelle Angel." At first, trial counsel said no. However, he then said he thought she was associated with Unjolee Moore, one of the Petitioner's codefendants. Trial counsel did

not speak with Myra Collier, who was at Bernard Hughes' house at the time of the shooting. He recalled the name "Ariel" being mentioned in some of the codefendants' statements, but he did not try to find or interview her. He also recalled that codefendants Steven Ballou and Moore were accused in separate robberies prior to their involvement in Hughes' death; however, he did not interview anyone related to the other offenses to see if there was a connection to the Petitioner.

Trial counsel testified that he filed several motions before trial, one of which related to the Petitioner's cellular telephone. The issue was that the Chattanooga police examined the telephone but never collected it. Trial counsel thought that was significant and wondered if the police did not collect the telephone because it contained exculpatory information. He recalled that the police behaved in an "unusual" manner in response to questioning about the telephone.

Trial counsel testified the he did not subpoena the Petitioner's telephone records or have location analysis performed because he "didn't know what was on the cell phone" and was concerned about producing evidence that could be used against the Petitioner. The Petitioner never indicated that there would be exculpatory evidence on his telephone or assured trial counsel that it did not contain inculpatory information, which was part of trial counsel's decision not to subpoena the telephone records. He elaborated that he never wanted to "create evidence that could be used against a client" and that he did not know what kind of evidence would be found if he subpoenaed the records.

Trial counsel recalled that codefendant Simpson gave two different statements to the police and that Simpson testified in at least three hearings before the Petitioner's trial. Trial counsel listened to both of the statements and reviewed transcripts of Simpson's prior testimony. Trial counsel said he went to trial assuming that Simpson would testify in accordance with Simpson's first statement to the police in order to get a lighter sentence. Therefore, he prepared an extensive cross-examination based on inconsistencies between Simpson's statement and the physical evidence. However, Simpson testified that the Petitioner "was in fact not involved," and trial counsel did not know what Simpson was going to say if he asked Simpson additional questions. Trial counsel explained, "My concern was that at that point any further impeachment I tried to do, risked [muddying] those waters as well as [risked] him changing his mind again and testifying in accordance with the statement and saying things that would be damaging to [the Petitioner]." Trial counsel also was concerned that further cross-examination could open the door to additional portions of Simpson's statement coming into evidence.

Trial counsel testified that Timothy Westfield's testimony at the preliminary hearing was inconsistent with his trial testimony and that Westfield "tended to exaggerate things in inconsistent ways." Trial counsel did not consider filing a motion to suppress

Westfield's identification of the Petitioner because he did not think there was a legal basis for such a motion. However, he attacked the credibility of Westfield's identification by having an eyewitness identification expert, Dr. Neuschatz, testify to undermine the State's eyewitness proof.

Trial counsel testified that the State's "lowest" offer to the Petitioner was for a plea to second degree murder with a fifteen-year sentence "to serve." He conveyed the offer to the Petitioner, but the Petitioner was not interested in the offer.

Trial counsel testified that he and the Petitioner discussed whether the Petitioner would testify and the Petitioner's right to testify. Trial counsel advised the Petitioner not to testify because he did not think the jury would find the Petitioner credible. Trial counsel did not tell the Petitioner that he was concerned about the Petitioner's misdemeanor record if he chose to testify. Trial counsel emphasized that he would not have told the Petitioner that he could be asked about being a suspect in another murder if he testified. Trial counsel recalled that the substance of the Petitioner's testimony would have been an alibi defense, but the Petitioner did not give him any first or last names, which made the possibility of locating alibi witnesses very difficult. The Petitioner never told him that the Petitioner was in a crowded bar, J.J.'s, with potential alibi witnesses.

Sergeant Michael Wenger of the CPD testified that he was the lead investigator in the case. Sergeant Wenger interviewed Simpson and took two formal statements from him. Sergeant Wenger recalled a number of things that Simpson told the police that turned out to be untrue or unsubstantiated. However, there also were numerous consistencies between what Simpson told him and what the evidence showed.

Sergeant Wenger testified that the recorded portion of his interview with Simpson was a "mirror" of the conversation they had prior to starting the recording. He said it was common practice for investigators to interview a suspect prior to the recorded interview so that the recorded interview was "in a chronological order" and "more understandable." He denied giving Simpson information about the shooting prior to the recorded interview or telling Simpson that he was "after" the Petitioner. Sergeant Wenger reiterated that he was not "targeting" the Petitioner. Sergeant Wenger thought Simpson's statement was based on Simpson's own recollections.

Sergeant Wenger testified that he was not aware of a photograph array ever being shown to Timothy Westfield. If an array had been shown to Westfield, it would have been reflected in "someone's" report, and Sergeant Wenger would have been made aware of it. Sergeant Wenger recalled that no one other than Simpson and Westfield gave the police any information that the Petitioner was involved in the crime. On cross-

examination, though, Sergeant Wenger recalled that codefendant Unjolee Moore identified the Petitioner as one of the perpetrators.

The Petitioner testified that he knew Unjolee Moore from cutting Moore's hair in 1998 or 1999 but that he did not see Moore again until a couple of weeks before the shooting. He was familiar with Simpson from living in the same neighborhood. The Petitioner claimed that he asked trial counsel to contact Michelle Angel because she was Moore's girlfriend, and Moore was directly involved in the case. He said that he did not know Ms. Angel or any of the other people involved in the shooting, including the victims.

The Petitioner testified that he was at J.J.'s nightclub on the night of the shooting. He told trial counsel that he was there and that the "bouncers" knew him. He said he also told trial counsel that he was at someone's home cutting hair before going to J.J.'s. He gave trial counsel nicknames and the full name of one of the witnesses, and he told trial counsel the name of the housing project where the witnesses lived. The Petitioner complained that trial counsel "never did anything I asked him," such as subpoena witnesses, follow up on his alibi, or cross-examine Simpson.

The Petitioner testified that in his opinion, Simpson's only concern after being arrested was getting out of the situation by any means necessary. The Petitioner stated that according to Simpson, Sergeant Wenger told Simpson, "[Y]ou make sure I get [the Petitioner] and I'll make sure you don't get a life sentence." The Petitioner denied threatening Simpson if Simpson testified at trial. The Petitioner said he was in the lowest custody level possible in prison and could not be in that level if he were an active gang member or had violence on his record.

The Petitioner testified that the only portion of Simpson's recorded statement that the State played at trial was the part in which Simpson said he saw the Petitioner raise the gun and shoot Hughes. The Petitioner said that trial counsel asked Simpson "less than five questions" on cross-examination, establishing only that Simpson did not actually see the Petitioner shoot Hughes and that Simpson's original statement to the police was false. The Petitioner stated that he asked trial counsel to introduce evidence of Simpson's frequent dishonesty, such as his story about guns being buried in the backyard and the car hitting another car while leaving the shooting, but trial counsel did not. The Petitioner speculated that Simpson substituted the Petitioner for Moore's role in the shooting, as well as removed himself from being an aggressor.

The Petitioner testified that he was aware that Simpson had written several jailhouse letters, including one saying Simpson shot Hughes in the shoulder. In Simpson's first statement to the police, though, Simpson said that Hughes was shot one

time and that the Petitioner was the shooter. In actuality, Hughes was shot in the head and the chest by two different caliber guns. The Petitioner asserted that trial counsel also should have impeached Simpson about his claim that his family members were receiving threats because none of Simpson's recorded jailhouse telephone calls referred to threats.

The Petitioner testified that trial counsel advised him not to testify because the State would use his misdemeanor record against him. He said that trial counsel only spoke to him about a twenty-five-year plea offer for this case and another case but that he did not want to "cop out to something that [he was] not even charged with." The Petitioner said he would have accepted a fifteen-year offer.

The Petitioner testified that he used to be a member of the Gangster Disciples but was no longer in a gang. Simpson also was a member of the Gangster Disciples. The Petitioner acknowledged that a gang member was not supposed to "snitch" on a fellow member and said that there were "consequences" for doing so. The Petitioner acknowledged that he had told people while he was in prison that he was "second in command" in one of the prison gangs. That statement was not true, though. He denied being involved in Simpson's prison stabbing.

At the conclusion of the hearing, the post-conviction court entered a lengthy order denying the petition for post-conviction relief. The Petitioner filed a motion to reconsider and reopen the proof, arguing that he should be allowed to recall trial counsel in order to ask why trial counsel did not raise two issues on direct appeal: the State's improper reliance on codefendant Simpson as a witness and the State's improper closing argument. The post-conviction court denied the motion.

The Petitioner appeals the court's denial of his petition for post-conviction relief, arguing that the State violated due process by: (1) bolstering Westfield's trial testimony with Westfield's pretrial identification, which was obtained under the suggestive conditions of the preliminary hearing and (2) impermissibly impeaching Simpson's trial testimony with Simpson's prior inconsistent statement, which was obtained under the pressure of a plea deal and uncorroborated by other evidence. In addition, he raises six issues regarding his receiving the ineffective assistance of trial counsel: (1) counsel failed to conduct an adequate pretrial investigation that would have revealed evidence to corroborate his alibi; (2) counsel failed to inform him about a fifteen-year plea offer; (3) counsel failed to suppress Westfield's in-court identification, which the State used to bolster the witness; (4) counsel failed to cross-examine Simpson about the circumstances surrounding his plea deal and the false information he provided to the police; (5) counsel failed to advise the Petitioner adequately about his right to testify; and (6) counsel failed to challenge the sufficiency of the evidence on direct appeal. He further argues that he is entitled to relief based on cumulative error.

- 10 -

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

### A. Identification Procedure

First, the Petitioner makes the stand-alone claim that the State employed an unduly suggestive identification procedure in eliciting Westfield's identification of him at the preliminary hearing. However, this issue had been waived because the Petitioner did not include it in his post-conviction petition or any of the amended petitions. "Issues not included in a post-conviction petition may not be raised for the first time on appeal and are waived." Bobby J. Croom v. State, No. W2015-01000-CCA-R3-PC, 2016 WL 690689, at *8 (Tenn. Crim. App. at Jackson, Feb. 19, 2016) (citing Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005); Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004)).

Moreover, this issue should have been raised on direct appeal of his convictions. As this court has explained:

It is well established that a party may not raise an issue in a post-conviction petition that could have been raised on direct appeal. State v. Townes, 56 S.W.3d 30, 35 (Tenn. Crim. App. 2000). "A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-206(g). "The opportunity to raise the issue during a direct appeal of the conviction, coupled with a failure to pursue that appeal or a failure to raise the issue during that appeal, constitutes a waiver of the issue pursuant to

Code section 40-30-206(g)[1] for purposes of a post-conviction relief proceeding." Townes, 56 S.W.3d at 35.

Andrew Cole v. State, No. W2002-01432-CCA-R3-PC, 2003 WL 22071451, at *4 (Tenn. Crim. App. at Jackson, Aug. 29, 2003). Nevertheless, we will address the identification procedure below in the context of ineffective assistance of counsel.

## B. Eliciting False Testimony

Next, the Petitioner makes the stand-alone claim that the State knowingly elicited false testimony from codefendant Simpson in violation of the Petitioner's due process rights and principles of fairness. However, this issue also has been waived because it should have been presented on direct appeal. See id.

Regardless, the Petitioner asserts that "[d]espite the fact that none of Mr. Simpson's statements were corroborated by the police investigation, the State forced Mr. Simpson to testify at [the Petitioner]'s trial because it wanted the jury to hear the one pre-trial statement that implicated [him] in the crimes." However, this court already disposed of this claim on direct appeal when the Petitioner argued that the State impermissibly called Simpson as a witness for the sole purpose of impeaching him with his otherwise inadmissible statement—an argument this court rejected. Harold Francis Butler, No. E2014-00631-CCA-R3-CD, 2015 WL 2233122, at *8.

Even if not waived or previously decided, the claim is without merit. When a witness testifies falsely, either on direct or cross-examination, the State has an affirmative duty to correct the false testimony. State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). To prevail on his claim that the State knowingly presented false testimony, the Petitioner must establish by a preponderance of the evidence "(a) that false or perjured testimony was admitted at trial, (b) that the [S]tate either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial." Roger Morris Bell v. State, No. 03C01-9210-CR-00364, 1995 WL 113420, at *8 (Tenn. Crim. App. at Knoxville, Mar. 15, 1995).

The Petitioner contends that "none of Mr. Simpson's pre-trial statements were supported or corroborated by credible information in the State's possession." However, the post-conviction court found that the jury returned a verdict of guilt based in part on the following evidence that corroborated Simpson's testimony: Westfield's initial description of the shooter, which matched the Petitioner; Westfield's initial description of

---

[1] Former Tennessee Code Annotated section 40-30-206 has been renumbered to Tennessee Code Annotated section 40-30-106.

the shooter matched the Petitioner more than any of the other suspects; the general agreement between Westfield's and Simpson's accounts of the events; the shoe found at the scene was the Petitioner's size and not the size of any of the other suspects or the victims; DNA on the shoe did not exclude the Petitioner or Westfield but excluded the other suspects; and the possibility from the pre-search disturbance of earth behind the Petitioner's residence that Simpson was correct in that firearms had been buried behind the residence. The court also found that Simpson's inculpation of himself and the Petitioner was consistent with Moore's inculpation of Simpson and the Petitioner. The Petitioner's claim that no credible proof linked him to the crimes is incorrect, and the Petitioner's allegation that the State knowingly presented false testimony has not been established by a preponderance of the evidence.

### C. Ineffective Assistance of Counsel

The Petitioner claims that he received ineffective assistance of counsel because trial counsel: (1) failed to conduct an adequate pretrial investigation that would have revealed evidence to corroborate his alibi; (2) failed to inform the Petitioner about a fifteen-year plea offer that he would have accepted; (3) failed to suppress the in-court identification used by the State to bolster its eyewitness; (4) failed to cross-examine Simpson about the circumstances surrounding his plea deal and the false information he provided to the police; (5) failed to advise the Petitioner adequately about his right to testify; and (6) failed to challenge the sufficiency of the evidence on direct appeal.

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

[b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

1. Pretrial Investigation

The Petitioner contends that trial counsel rendered ineffective assistance by failing to conduct an adequate pretrial investigation, which would have revealed evidence to corroborate his alibi. Specifically, he asserts that trial counsel's investigation was deficient in three areas: trial counsel did not interview key witnesses Michelle Angel, Myra Collier, and "Ariel"; did not investigate his alibi defense; and did not preserve his cellular telephone records.

As to trial counsel's failure to interview the above-named witnesses or investigate the Petitioner's alibi defense, the Petitioner did not present the testimony of the three named witnesses or any alleged alibi witnesses at the evidentiary hearing. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit any witness might have offered to the Petitioner's case. Id. In addition, "[w]ithout offering any proof as to an alibi, the petitioner cannot demonstrate that he was prejudiced by his trial attorneys' failure to investigate and raise an alibi defense." Michael Stanley Dotson v. State, M2001-00045-CCA-R3-PC, 2002 WL 369901, at *7 (Tenn. Crim. App. at Nashville, Mar. 8, 2002).

Moreover, with regard to trial counsel's investigation of the Petitioner's alibi, trial counsel testified that he and the Petitioner discussed an alibi defense but ultimately decided not to present such a defense. Counsel testified that the Petitioner's alibi was never very definitive and that counsel did not think he had enough information to find the people the Petitioner mentioned only by nickname. The post-conviction court found no deficiency in counsel's actions and accredited trial counsel's testimony that the Petitioner "did not mention a crowded bar or provide counsel with any specific information, names, addresses, or times" from which an alibi could be corroborated.

Regarding the cellular telephone records, trial counsel testified at the hearing that the Petitioner never indicated the telephone contained any exculpatory information or assured him that it did not contain inculpatory information, which played a role in trial

counsel's decision not to subpoena the telephone records. The post-conviction court accredited trial counsel's testimony and found trial counsel's decision to be reasonable given that the Petitioner transferred the telephone to a third party sometime after the shooting and that the police found the telephone in the possession of the third party. The court noted that the State's lack of cellular telephone records connecting the Petitioner to the codefendants and the crime scene created a favorable inference to the defense.

On direct appeal of his convictions, this court analyzed an exculpatory evidence claim by the Petitioner and observed,

> Although the defendant argues that the telephone would have been relevant to determine his location at the time of the murder, hence potentially providing the defendant with an alibi, his argument is misplaced. The mere location of the telephone, or the fact that it was being used for text messaging or other data entry, would in no way prove that the defendant was in possession of the telephone at that time.

Harold Francis Butler, No. E2014-00631-CCA-R3-CD, 2015 WL 2233122, at *5. Furthermore, the Petitioner's own witness testified at the evidentiary hearing that his analysis of the telephone records would have produced an inaccurate result and would have placed the telephone within a sector that composed several square miles. Therefore, we conclude that the Petitioner has failed to establish prejudice.

2. Plea Offer

The Petitioner asserts that trial counsel rendered ineffective assistance by failing to inform him about a fifteen-year plea offer that he would have accepted. We conclude that the Petitioner is not entitled to relief.

The Strickland standard also applies during plea negotiations. Missouri v. Frye, 566 U.S. 134, 143-48 (2012); Nesbit v. State, 452 S.W.3d 779, 787 (Tenn. 2014). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Frye, 566 U.S. at 145.

The Petitioner testified that trial counsel conveyed a twenty-five-year offer that he did not accept. Trial counsel testified that he conveyed a fifteen-year offer to the Petitioner but that the Petitioner was not interested in the offer. The post-conviction court did not think that the State extended a fifteen-year offer to the Petitioner, reasoning that it was unlikely that the Petitioner, who was the alleged shooter, would have received a more favorable offer than codefendant Simpson, who was cooperating and was not the

shooter. The court determined that absent any evidence to corroborate the fifteen-year offer, the evidence indicated that the offer was for twenty-five years. Accordingly, the post-conviction court found no clear and convincing evidence of deficiency in counsel's performance, and we conclude that nothing preponderates against the court's determination.

3. Suppression of Identification

The Petitioner asserts that trial counsel rendered ineffective assistance by failing to suppress Westfield's in-court identification, which the State used to bolster the witness. Again, we conclude that the Petitioner is not entitled to relief.

When a Petitioner claims that counsel was constitutionally ineffective by failing to file pretrial motions to suppress evidence, the Petitioner must show that a motion to suppress would have been granted and that there was a reasonable probability the proceedings would have concluded differently. Vaughn v. State, 202 S.W.3d 106, 120 (Tenn. 2006). In Neil v. Biggers, the United States Supreme Court established a two-part analysis to assess the validity of a pretrial identification. 409 U.S. 188, 198-99 (1972). First, the trial court must determine whether the identification procedure was unduly suggestive. Id. at 198. "To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." State v. Cribbs, 967 S.W.2d 773, 794 (Tenn. 1998) (citing Simmons v. United States, 390 U.S. 377 (1968)). If the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Biggers, 409 U.S. at 198-99. The Supreme Court identified five factors for determining the reliability of an identification: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. 409 U.S. at 199-200; see also State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). If, using the Biggers standard, a pretrial confrontation was so impermissibly suggestive that it violated an accused's right to due process, both the out-of-court and in-court identifications are excluded. State v. Shanklin, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

Regarding trial counsel's failure to file a motion to suppress Westfield's in-court identification of the Petitioner based on an unduly suggestive identification procedure used at the preliminary hearing, the post-conviction court found that from the totality of the circumstances, Westfield's identification of the Petitioner was sufficiently reliable to be admissible and, therefore, that there was no prejudicial deficiency in the failure to seek

suppression. At the evidentiary hearing, trial counsel testified that he did not consider filing a motion to suppress Westfield's identification because he did not think there was a legal basis for such a motion. However, he attacked the credibility of Westfield's identification by calling an eyewitness identification expert to undermine the State's eyewitness proof at trial. Counsel recalled that Westfield seemed to think that the Petitioner was one of the people involved in the shooting even before the preliminary hearing.

As noted by the post-conviction court, the circumstances that weighed in favor of the reliability of the identification included: Westfield's initial, apparently clear, pre-struggle view of the perpetrators at the front door, about ten feet away, and in decent view from two porch lights; the visibility of the shooter's eyes and the bridge of his nose despite wearing a half-mask; the distinctiveness of the shooter's eyes and the high bridge of the shooter's nose; and Westfield's description of himself as an artist who paid "very close attention to detail" and his creation of composite drawings of the shooter's eyes and nose. The court noted that despite Westfield's initial statement that he did not know either of the perpetrators, by the time of the preliminary hearing, which was within two months of the shooting, Westfield was certain about his identification of the Petitioner. The court found that Westfield's explanation at trial for his certainty was credible.

The Petitioner has failed to demonstrate that a motion to suppress would have been granted. The post-conviction court's findings, which are attuned to the concerns of the Biggers factors, support the reliability of the identification. In addition, the record reveals strategic decision-making on counsel's part that he did not think he had a legal basis to suppress the identification and, instead, attacked the reliability of the identification.

4. Cross-Examination of Simpson

The Petitioner claims that trial counsel rendered ineffective assistance by failing to cross-examine Simpson about the circumstances surrounding Simpson's plea agreement and the false information he provided to police. We conclude that the Petitioner has failed to show that he is entitled to relief.

Trial counsel testified that on cross-examination, he elicited from Simpson that Simpson lied to the police about the Petitioner's involvement in the shooting. Trial counsel said that he decided not to cross-examine Simpson further because he was concerned that any further attempts at impeachment would risk Simpson's changing his mind again and offering unfavorable testimony. Trial counsel also was concerned that further cross-examination could open the door to additional portions of Simpson's statement to police being admitted into evidence. The post-conviction court found that

trial counsel limited his cross-examination for fear of opening the door to more of Simpson's prior statements. Additionally, the court noted that trial counsel cross-examined Sergeant Wenger about inaccuracies in Simpson's statements to police.

This court has previously noted that "cross-examination is a strategic and tactical decision of trial counsel which is not to be measured by hindsight." State v. Kerley, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). Moreover, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). Given Simpson's history of contradictory statements, we conclude that trial counsel's strategy was reasonable, and we will not second-guess counsel's decision. We note, as did the post-conviction court, that trial counsel elicited additional impeachment of Simpson by questioning Sergeant Wenger about inaccuracies in Simpson's statements to police.

5. Advice on Testifying

The Petitioner argues that trial counsel rendered ineffective assistance by failing to advise him adequately about his right to testify. He asserts that trial counsel advised him that his misdemeanor criminal history could be used against him if he chose to testify.

At the evidentiary hearing, trial counsel testified that he and the Petitioner discussed whether the Petitioner would testify and the Petitioner's right to testify. He said he advised the Petitioner not to testify because he did not think the jury would find his testimony credible. He said he did not tell the Petitioner that the State could question the Petitioner about his misdemeanor record if the Petitioner chose to testify.

The post-conviction court accredited trial counsel's testimony. The court noted that the defense's theory was misidentification and that presenting noncredible testimony would have made the Petitioner seem more like a dishonest perpetrator and less like an innocent victim of misidentification. The evidence does not preponderate against the findings of the post-conviction court.

6. Challenge to Sufficiency of the Evidence on Direct Appeal

Finally, the Petitioner argues that trial counsel rendered ineffective assistance by failing to challenge the sufficiency of the evidence on direct appeal. However, the Petitioner has waived this issue for failing to raise it in his post-conviction petition or amended petitions. See State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) (stating that "[o]rdinarily, issues raised for the first time on appeal are waived"). Even in his motion to reopen the post-conviction proof, the Petitioner did not specifically allege

that counsel should have challenged the sufficiency of the evidence on appeal, although he specifically alleged other deficits.

The Petitioner suggests that because this court routinely reviews sufficiency even when it has otherwise been waived, it should do so here. However, that rule applies to direct appeals, not post-conviction appeals. "It has long been established in this jurisdiction that a petitioner may not litigate the sufficiency of the evidence in a post-conviction suit." Workman v. State, 868 S.W.2d 705, 711 (Tenn. Crim. App. 1993).

The Petitioner also suggests that this court could reverse the post-conviction court's denial of his motion to reopen the proof and remand the case in order for him to develop the issue. In support of his claim, the Petitioner cites Tennessee Code Annotated section 40-30-117(a)(4). However, the entire statute for reopening a post-conviction proceeding provides as follows:

(a) A petitioner may file a motion in the trial court to reopen the first post-conviction petition only if the following applies:

(1) The claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. The motion must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial; or

(2) The claim in the motion is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or

(3) The claim asserted in the motion seeks relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid, in which case the motion must be filed within one (1) year of the finality of the ruling holding the previous conviction to be invalid; and

(4)  It appears that the facts underlying the claim, if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced.

Tenn. Code Ann. § 40-30-117(a) (emphasis added).  The Petitioner's attempt to show ineffective assistance of counsel for failure to challenge sufficiency does not fit any of the three narrow statutory scenarios.  Therefore, he is not entitled to relief.

### D.  Cumulative Error

Finally, the Petitioner contends that he is entitled to relief based upon cumulative error.  However, the Petitioner has not shown any error.  Accordingly, we find no merit to this claim.

### III. Conclusion

We affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE